PETTIGREW, J.
| sDefendants challenge the trial court’s judgment, granting a preliminary injunction in favor of plaintiffs and intervenor and denying their exceptions raising the objections of no cause of action, lack of subject matter jurisdiction, prematurity, and improper cumulation. For the reasons that follow, we amend the trial court’s September 10, 2014 judgment and affirm as amended. Wé also deny defendants’ application for a writ of supervisory review.
FACTS AND PROCEDURAL HISTORY
This action commenced with a petition for preliminary and permanent injunctions, and declaratory relief filed on July 22, *992 2014, by plaintiffs herein, Navis Hill;[1] Michael and Amanda Stenson;[2] Illumani Johnson;[3] Erin Comeaux;[4] Latricia Bowers; [5] Carrie Adams;[6] Courtney Dumas;[7] Catherine Golden;[8] and Choice Foundation,[9] seeking to enjoin defendants herein, Bobby Jindal, in his official capacity as the Governor of the State of Louisiana; the State of Louisiana, through the Division of Administration (“DÓA”) and DOA, Office of Contractual Review (“OCR”); Kristy Nichols, in her official capacity as Commissioner of DOA; and Pamela Bartfay Rice, in her official capacity as Interim Director of OCR (collectively the “DOA defendants”) from interfering with the l4Board of Elementary and Secondary Education’s (“BESE”) implementation of educational standards in Louisiana schools, through audited contracts. Along with their petition, plaintiffs filed a motion for preliminary injunction, which was set for hearing by the trial court. Plaintiffs alleged that defendants’ actions, including Governor Jindal’s Executive Orders Nos. BJ 2014-6[10] and BJ 2014-7[11] and OCR’s June 18, *993 2014 suspension of contracts related to student assessments for the 2014-1015 school year, amounted to an unconstitutional violation of the separation of powers doctrine and exceeded the lawful scope of their authority. See La. Const, art. II, §§ 1-2.
On July 29, 2014, BESE filed a petition for intervention also seeking to enjoin defendants from enforcing, applying, and/or implementing, in whole or in part, Executive Orders Nos. BJ 2014-6 and BJ 2014-7, as well as OCR’s actions with regard to | fjthe contracts at issue. BESE filed a motion for preliminary injunction on August 6, 2014. On August 4,2014, .Governor Jindal filed a third party demand against BESE seeking a declaration that the Memorandum of Understanding (“MOU”), entered into between Partnership For Assessment of Readiness For College and Careers Members (“PARCC”) and the State, was invalid and unenforceable, or alternatively, a declaration of the rights of the State under the MOU and the legal relationship between the parties to the MOU.
‘ In response to plaintiffs’’ suit, defendants filed exceptions raising the objections of no right of action, no cause of action, lack of subject matter jurisdiction, prematurity (failure to exhaust administrative remedies), and improper cumulation of actions. In response to BESE’s intervention, the DOA defendants filed exceptions raising the objections of no cause of action, lack of subject matter jurisdiction, prematurity, and improper cumulation.
On August 13, 2014, the trial court denied defendants’ objections as to plaintiffs’ petition. A judgment was signed in accordance with this ruling on August 26, 2014. Defendants sought supervisory review of the trial court’s ruling, and on November 14, 2014, this court issued the following:
WRIT REFERRED TO THE PANEL TO WHICH THE YET-TO-BE LODGED APPEAL OF THE SEPTEMBER 10, 2014 JUDGMENT GRANTING [PLAINTIFFS’] AND THE BOARD OF ELEMENTARY AND SECONDARY EDUCATION’S PETITIONS FOR INJUNCTIVE RELIEF IS ASSIGNED.
Hill v. Jindal, 2014-1484 (LaApp. 1. Cir. 11/14/14) (unpublished writ action).
The motions for preliminary injunction filed by plaintiffs and BESE proceeded to hearing on August 18, 2014, at which time the trial court also considered the DOA defendants’ exceptions as to BESE’s intervention. The trial court heard testimony, considered documentary evidence introduced by the parties, - and took the matter under advisement. The trial court submitted a written ruling on August 19, 2014, granting the motions for preliminary injunction filed by plaintiffs and BESE, seeking to enjoin defendants from enforcing, applying, and/or- implementing, in whole or in part, Governor Jindal’s Executive Orders Nos. BJ 2014-6 and BJ 2014-7, and OCR’s June 18, | ⅛014 suspension of State.issued contracts relating to the implementation of State educational assessments. The trial court further denied the DOA defendants’ exceptions related to *994 BESE’s intervention.[12] The trial court signed a judgment on September 10, 2014, providing, in pertinent part, as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that the exceptions of prematurity, no cause of action, lack of subject matter jurisdiction, and improper cumulation of actions be and are hereby DENIED.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the motions for preliminary injunction filed by plaintiffs and by the Louisiana Board of Elementary and Secondary Education be and are hereby GRANTED, and that all defendants and anyone acting or purporting to act on behalf of any of them are hereby enjoined, restrained and prohibited from enforcing, applying and/or implementing, in whole or in part, Governor Jindal’s Executive Orders Nos. BJ 2014-6 and BJ 2014-7, as well as the suspension of contracts related to state educational assessments, specifically including the 2003 and 2011 contracts with Data Recognition Corporation, together with all amendments to such contracts.

Pertinent Background Facts and Information

Pursuant to La. Const, art. VIII, § 1, the Legislature shall provide for the education of the people of the State and shall establish and maintain a public educational system. At the direction of the Legislature, BESE is given the power to supervise and control the State’s public schools and implement the Legislature’s educational policy. Aguillard v. Treen, 440 So.2d 704, 709 (La.1983); La. Const. art. VIII, § 3(A).
During the August 18, 2014 hearing on the motions for preliminary injunction, State Superintendent of Education, for the Department of Education (“DOE”), John White testified at length regarding the issues leading up to this lawsuit. He indicated he had been hired as superintendent in January 2012. Superintendent White discussed the Louisiana Education Assessment Program (“LEAP”), which he explained was part of the Louisiana Competency-Based Education Program and was first implemented in 1999, to establish an education system based on benchmarks. See La. R.S. 1717:24.4(A)(1), (2). He noted that the LEAP program includes a series of tests for grades three through eleven in English, Math, Social Studies, and Science, and BESE and DOE are charged with implementing the program in the school system. Superintendent White added that over time, these tests have changed as the needs and expectations of the school system have evolved. Superintendent White further testified that the results of these LEAP assessments have significant consequences for the superintendents of local school systems and affect school ratings, teacher evaluations, and compensation, and determine whether students are promoted to the next grade level or retained.
When asked about the Common Core State Standards (“Common Core”), Superintendent White indicated Common Core had been created by the National Governor’s Association and the Counsel of Chief State School Officers in an effort to achieve “common standards” and “common expectations” across the participating states with regard to grade level expectations. He noted that more than eighty percent of states had approved Common *995 Core for use in their school system. In July 2010, BESE voted to approve the adoption of Common Core. According to Superintendent White, his predecessor, John Pastorek, had begun implementing Common Core in the 2010-2011 school year.
Superintendent White recalled for the trial court the role DOE played in codifying the State’s commitment to Common Core. With his attention focused on Act Number 275 of the 2012 Regular Session, Superintendent White stated that members of his staff assisted in the drafting of the legislation, conversed with Governor Jindal’s staff, and testified in both chambers in support of the bill. According to Superintendent White, everyone supported the passage of Act 275 and it “flew through both the House and the Senate.”
As amended by Acts 2012, No. 275, § 1, La. R.S. 17:24.4(F)(l)(d), mandated that beginning with the 2014-2015 school year, the standards-based assessments implemented by BESE be based on “nationally recognized content standards that represent the knowledge and skills needed for students to successfully transition to 1 Rpostsecondary education and the workplace.” The Legislature further ordered that the “rigor of each standards-based assessment, at a minimum, shall be comparable to national achievement tests.” La. R.S. 17:24.4(F)(l)(e) (as amended by Acts 2012, No. 275, § 1). When asked about his understanding of the meaning of “nationally recognized content standards,” Superintendent White indicated that this was a reflection of the State’s commitment to Common Core and the PARCC tests.
Superintendent White testified regarding the State’s relationship with PARCC, a voluntary collaborative that engages experts and educators from its member States to design high-quality standardized test questions and test policies that allow for the comparison of student achievement across states. In June 2010, Louisiana entered into a MOU with other member states of PARCC. This agreement was signed by the Governor, as well as then State Superintendent of Education John Pastorek, and the President of BESE, and committed the State to participate in PARCC. An addendum to the MOU regarding participation in the procurement process was signed by then Chief Procurement Officer Denise Lea.
When asked how DOE provided for statewide testing to implement LEAP, Superintendent White gave the following explanation:
Well, there are a number of services that need to be involved. You’re talking about hundreds of thousands of kids. And, while developing the test questions is a piece of that, and as I discussed we have been long in the process of developing the PARCC questions, most of the activity and most of the spending related to testing has to do with operations issues like delivering the content of the— excuse me, delivering the tests to schools, printing them, picking them up from schools, and then the most expensive and labor-intensive portion is scoring the tests. Subsequent to scoring the tests, there’s statistical analysis done to ensure the validity and stability of test scores. And, subsequent to that, there are reporting activities where the results are compiled into coherent reports at the student level, at the teacher level, at the school level. All of those activities come under one vendor that has historically provided those services at the elementary school and middle school level. We also have a different vendor who has historically provided those service[s], a couple of them, at the high school level.
He went on to describe contracts that DOE had entered into with Data Recogni *996 tion Corporation (“DRC”), a vendor that provides this full range of services, • explaining that over the last fifteen years, there has been a relationship between DOE and DRC.
^Superintendent White was asked about two DRC contracts in particular. The first contract is dated July 22, 2003 (“2003 DRC Contract”). It was signed by various State officials on July 24, 2003, and was approved by the Department of State Civil Service on September 19, 2003, and by the Office of the Governor, OCR on October 22, 2003. According to Superintendent White, the 2003 DRC Contract exists to provide services for grades three, five, six, and seven in English, Math, Social Studies, and Science. Although the 2003 DRC Contract contains numerous amendments, as testified to by Superintendent White, each of the signature pages on the amendments bear a stamp of approval from the Office of the Governor, OCR. The 2003 DRC Contract' terminates on June 30, 2015.
The second contract that Superintendent White was asked to identify is dated June 8, 2011 (“2011 DRC Contract”). According to the record, the 2011 DRC Contract was a “sole source contract,” ie., a contract “awarded to one vendor because of either the onerous nature of enacting a competitive bid or becausé of the lone appropriateness of that particular vendor.” Superintendent White indicated that "this was likely in response to the State’s need for continuity during the process of changing its academic standards. This Contract was also signed by various State officials and was approved on July 20, 2011, by the Office of the Governor, OCR. The 2011 DRC Contract was to provide services for grades four and eight in English,- Math, Social Studies, and Science. Superintendent White confirmed that this contract was for “high-stakes” testing. Similar to the 2003 DRC Contráct, the 2011 DRC Contract also had several amendments, each of which had been approved by the Office of the Governor, OCR. The 2011 DRC Contract terminates on June 30, 2015.
The record reveals that the 2011 DRC Contract was actually a continuation of a prior contract with DRC. According to Superintendent White, .this contract dates back to 1999, and the substance of the contract was originally going to be handled by amendment. He explained that although he was not with DOE at that time, he had been told it was decided that the better course of action was to create a new contract. Superintendent White identified a series of emails concerning the 2011 DRC Contract |Tflwherein employees of both OCR and DOA approved the amendments submitted to the original contract and advised that “a new sole- source contract” should be submitted in its place as the “sole source concept [had] already been approved” by DOA.
In April 2014, Superintendent White be-' gan having conversations with the Governor’s Chief of Staff regarding the Governor’s intention to support legislation that would end Common Core in Louisiana and prohibit the usage of the PARCC test questions. Governor Jindal supported several bills geared towards ending the State’s commitment to Common Core and. the PARCC questions. All of the bills were defeated, and nothing changed with the general direction of DOE’s intentions with regard to Common Core.
Thereafter, on June 18, 2014, Governor Jindal sent a letter to PARCC purporting to withdraw the State from the consortium. Governor Jindal also issued .two. Executive Orders evidencing his adminis *997 tration’s opposition to Common Core.[13] Executive Order No. BJ 2014-6 accused BESE of inappropriately instructing DOE to purchase assessments in a method that may not be compliant with State law and suspended BESE’s revisions to the guidance it promulgated to guide educators and administrators in implementing the transition to standards-based assessments based on nationally recognized standards. The order purported to direct BESE to implement a process to authorize other assessments for the 2014-2015 school year. Executive Order No. BJ 2014-7 accused BESE of failing to comply with the State’s procurement laws and directed BESE to undertake a competitive bidding process to obtain assessments for students. The order also directed DOA to conduct an accounting of the State’s expenditures and contracts related to PARCC and to ensure BESE’s compliance with the State’s procurement law in procuring assessments for the 2014-2015 school year and subsequent years.
| T]On the same day the Governor issued his executive orders, Superintendent White received a letter from Pamela Bart-fay Rice, Interim Director of OCR, advising that although OCR had previously reviewed and approved the DRC contracts related to the implementation of State assessments, the contracts were being suspended pending further review of the scope of the services to be provided under the contracts. Ms. Rice’s letter noted that she had “reason to believe that some of the required certifications and supporting documentation may be insufficient,” and she suspended the authorization for payment pursuant to these contracts. Superintendent White testified that over time, the administration’s rationale behind the “suspension” of the contracts and what exactly was suspended changed several times.
On July 10 and 16, 2014, BESE, proposing to resolve the dispute, offered two proposals: 1) a plan that would incorporate PARCC material in assessments for the current school year, created by the State’s own test question development process, wherein material was immediately available, avoiding the need to contract or subcontract for this material (avoiding procurement issues); or 2) an offer to distribute a new request for proposal for the 2014-2015 school year that would result in assessments aligned with national standards. Defendants rejected both offers, prompting the instant suit by plaintiffs.

Appeals of the September 10, 2014 Judgment

Both Governor Jindal and the DOA defendants have separately appealed from the trial court’s September 10,.2014 judgment.[14] Governor Jindal assigns the following specification of error for our review:
*998 The trial court erred as a matter of law by enjoining the enforcement, application and/or implementation of Governor Jindal’s Executive Order Nos. BJ 2014-6 and 2014-7, issued pursuant to the Governor’s constitutional and statutory authority, based solely on the effects of those ordei's without considering whether those orders were unlawful, | ^.unconstitutional or outside the scope of Governor Jindal’s executive authority.
In a separate appeal, the DOA defendants assign the following specifications of error for our review:
• 1. The trial court erred in denying Defendants’ exceptions of no right and no cause of action as to [Plaintiffs’] claims, because these parties are not allowed to challenge procurement compliance actions by state officials.
2. The trial court erred in denying Appellants’ exceptions to BESE’s intervention claims, because BESE did not follow the administrative procedures established by the Legislature for disputes between state agencies over expenditures of state funds.[15]
3. The trial court erred in granting the preliminary injunction requested by Plaintiffs and BESE.
4. In the alternative, the trial court erred in granting a broad preliminary injunction that could inhibit DOA Officials in their responsibility to ensure BESE’s future compliance with applicable procurement laws.
DISCUSSION

Writ Application

Initially, we address the denial of defendants’ exceptions as to plaintiffs’ petition. In denying defendants exceptions, the trial court ruled as follows:
The plaintiffs have a right and cause of action to seek judicial review and seek judicial restraint against the defendants in this matter. The plaintiffs have alleged in their lawsuit against the defendants that they have transcended their lawful powers under the Louisiana Constitution and that their conduct has violated their lawful duties. The plaintiffs are afforded this right and cause of action upon a mere showing of an interest, however small and indeterminable. The evidence presented at the hearing of this matter has satisfied the requirement that each has a tangible interest in the matter that is before this court.
Defendants contend that plaintiffs have no substantial right and no legally protect-able or tangible interest related to the administrative procurement action taken by 11sMs. Rice concerning the contracts in this matter. Defendants aver there is no judicial relief available to plaintiffs on their claims as they are not parties to the contracts and have never been part of the procurement process. They submit plaintiffs did not present any facts to show how their rights would actually be affected or how they might actually be harmed by the *999 operation or the suspension of contracts between DRC and BESE. While defendants concede that BESE is a constitutionally-created board and DOE is a department of State government, each with the capacity to assert administrative or judicial claims, they maintain that plaintiffs failed to demonstrate any actual existing harm to them, other than vague references as to how their children would be assessed and the effect of the procurement actions on school assessments.
Defendants submit that Louisiana’s Professional Services Procurement Code (“PSPC”), La. R.S. 39:1551 et seq., provides that parties involved in the procurement process have a right to protest decisions made under the PSPC to the Commissioner of DOA and then to the 19th Judicial District Court, on appellate review.[16] They contend these provisions do not grant a cause of action to members of the public to directly challenge PSPC procurement decisions in State court. Defendants maintain that - while plaintiffs did not plead any statutory or constitutional violation by the OCR Director, the Commissioner of DOA, or the Governor, they pied BESE’s authority regarding the implementation of education assessments and claimed the suspension of the DRC contracts impinged on-such authority. Nevertheless, defendants contend that plaintiffs failed to identify any legal provision that relieved DOE and/or BESE of their responsibilities to comply with Louisiana’s procurement law or that .limited- OCR’s authority regarding oversight of BESE contracts. Thus, defendants submit plaintiffs failed to identify or properly plead any cause of action to enjoin their actions under the PSPC.
Alternatively, in the event the court finds plaintiffs have a right of action, as well as a cause of action, defendants contend plaintiffs have not exhausted their administrative | ^remedies prior to seeking judicial review. Defendants submit it is well established that review of administrative agency decisions, such -as those of the OCR Director and the Commissioner of DOA are properly addressed only under a district court’s appellate jurisdiction, as the exclusive means for review provided by the Legislature. Defendants maintain the administrative process is ongoing, ie., investigation and issuance of executive orders, suspension of DRC contracts pending OCR audit, and review of OCR’s action by DOA, and should have been exhausted before any party could seek appellate review in the 19th Judicial District Court.
Finally, defendants maintain that an action for injunctive relief may not be cumu-lated in the same proceeding with an appellate action for judicial review of an agency decision. They submit that to any extent plaintiffs were properly allowed to proceed with claims to invalidate the executive orders under the PSPC and other procurement laws, and are found to have' exhausted the required administrative process, plaintiffs may not cumulate actual claims for judicial review with actions for injunctive and declaratory relief.
In opposition, plaintiffs argue that they have clearly stated a cause of action and have standing, as well as a real and actual interest, to assert their claims as the assessment contracts at issue affect students, teachers, and schools in a myriad of ways, ie., they affect whether students are promoted to the next grade level, how teachers are compensated, how schools are rat *1000 ed, and the schools’ investments in order to prepare for the implementation of Common Core standards. Further, plaintiffs submit they do not need to exhaust any administrative remedy as the relief they seek is not from an agency decision, but rather defendants’ unconstitutional actions.
We agree with plaintiffs’ arguments. Having thoroughly reviewed the issues raised by defendants in this writ, as well as applicable law, we find no error in the trial court’s denial of defendants’ exceptions to plaintiffs’ petition. Accordingly, for the reasons set 11fiforth more fully below, we deny defendants’ application for supervisory writ of review.[17]

No Right of Action

The peremptory exception pleading the objection of no right of action tests whether the plaintiff has any interest in judicially enforcing the right asserted. La.Code Civ. P. art. 927(A)(6). Simply stated, the objection of no right of action tests whether this particular plaintiff, as a matter of law, has an interest in the claim sued on. OXY USA Inc. v. Quintana Production Co., 2011-0047, p. 12 (La.App. 1 Cir. 10/19/11), 79 So.3d 366, 376, writ denied 2012-0024 (La.3/2/12), 84 So.3d 536. The exception does not raise the question of the plaintiffs ability to prevail on the merits nor the question of whether the defendant may have a valid defense. Id. To prevail on an objection of no right of action, the defendant must shoiv the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with the suit. Whether a'plaintiff has a right of action is ultimately a question of law; therefore, it is reviewed de novo on appeal. Id. When a taxpayer seeks to restrain action by a public body he is afforded a light of action upon a mere showing of an interest, however small and indeterminable. Municipal Employees’ Retirement System v. Office of Rural Development, 95-2505, p. 4 (La.App. 1 Cir. 6/28/96), 676 So.2d 835, 837, writ denied 96-1989 (La.11/8/96), 683 So.2d 269.
In the instant case, plaintiffs are Louisiana taxpayers who have been significantly affected by defendants’ alleged unconstitutional actions. As correctly noted by the trial court, the evidence presented below “satisfied the requirement that each has a tangible interest in the matter that is before this court.” Thus, based on our de novo review, we find no error in the trial court’s denial of this exception.

No Cause of Action

The function of the peremptory exception raising the objection of no cause of action is to test the legal sufficiency of a pleading by determining whether the law |1fiaffords a remedy on the facts alleged in the pleading. Ourso v. Wal-Mart Stores, Inc., 2008-0780, pp. 3-4. (La.App. 1 Cir. 11/14/08), 998 So.2d 295, 298, unit denied, 2008-2885 (La.2/6/09), 999 So.2d-785. The exception is triable on the face of the pleadings, and, for the purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. Id, 2008-0780 at 4, 998 So.2d at 298. In reviewing a trial court’s ruling sustaining an exception raising the objection of no cause of action, appellate courts conduct a de novo review, because the exception raises a question- of law, and the trial court’s decision is based only on the sufficiency of the petition. Torbert Land Co., L.L.C. v. Montgomery, 2009-1955, p. 4 (La.App. 1 Cir.-7/9/10), 42 So.3d 1132, 1135, unit denied, 2010-2009 *1001 (La. 12/17/10), 51 So.3d 16. Having thoroughly reviewed the record and applicable law, we find no legal error in the trial court’s ruling on this exception. Accepting all of the allegations in the petition as true, and applying the-applicable legal principles to the fact herein, we find the trial court properly denied the exception raising the objection of no cause of action.

Alternative Exceptions of Lack of Subject Matter Jurisdiction, Prematurity, and Improper Cumulation

An exception raising the objection of prematurity pursuant to La.Code Civ. P. art. ■ 926(A)(1) raises the issue of whether the judicial cause of action has not yet come into existence because some prerequisite condition has not been fulfilled. Ginn v. Woman’s Hosp. Foundation, Inc., 99-1691, p. 3 (La.App. 1 Cir. 9/22/00), 770 So.2d 428, 430-431, writ denied, 2000-3397 (La.2/2/01), 784 So.2d 647. The objection contemplates that the plaintiff has filed his action prior to some procedure or- assigned time, and it is usually utilized in cases wherein the applicable law or contract has provided a procedure for one aggrieved of a decision to seek administrative relief before resorting to judicial action. Girouard v. State Through Dept. of Educ, 96-1076, p. 4 (La.App. 1 Cir. 5/9/97), 694 So.2d 1153, 1155. The party that raises the objection of prematurity has the burden of showing that an administrative remedy is available, by reason of which the judicial action is premature. Metro Riverboat Associates, Inc. v. Louisiana Gaming Control Bd., 99-2241, p. 6 (La.App. 1 Cir. 3/7/01), 798 So.2d 143, 147, writ denied, 2001-0818 (La.1/4/02), 805 So.2d 1188.
Jurisdiction is the legal power and authority of a court to hear and determine an action of the parties and to grant the relief to which they are entitled. La.Code Civ. P. art. 1. Subject matter jurisdiction is the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the -amount in dispute or the value of the right asserted. La.Code Civ. P. art. 2. The issue of subject matter jurisdiction addresses the court’s authority to-adjudicate the causebefore it.- The issue may be raised at any time and at any stage of an action. McPherson v. Foster, 2003-2696, p. 8 (La. App. 1 Cir. 10/29/04), 889 So.2d 282, 288, If a lack of subject matter jurisdiction is not apparent on the face of the plaintiffs petition, then the onus is on- the defendant to offer evidence-in support of the exception. La.Code Civ. P. art. 930; Crockett v. State Through Dept. of Public Safety and Corrections (Louisiana State Penitentiary, Angola), 97-2528, p. 5 (La.App. 1 Cir. 11/6/98), 721 So.2d 1081, 1084, unit denied, 98-2997 (La.1/29/99), 736 So.2d 838.
Defendants argue that the PSPC provides mandatory administrative procedures to resolve disputes regarding PSPC contracts and that these must be exhausted before seeking judicial review under the trial court’s appellate jurisdiction. Plaintiffs counter that their claims seek to halt defendants’ unconstitutional and ultra vires actions and do not implicate administrative remedies or the trial court’s appellate jurisdiction. We agree with plaintiffs.
It is well settled that administrative agencies are without power to decide constitutional issues. RCS Gaming, Inc. v. State Through Louisiana Gaming Control Bd., 97-2317, p. 1 (La.App. 1 Cir. 11/19/97), 705 So.2d 1124, 1124-1125 (per curiam) (holding trial court correctly denied exception raising the objection of prematurity-’ regarding constitutional claims against Louisiana Gaming Control Board). We further note that the district court cannot be held to .lack subject matter jurisdiction in the absence of constitutional au *1002 thority expressly granting exclusive jurisdiction to an administrative | ^agency or other tribunal. See La. Const. art. V, § 16; Paulsell v. State, Dept. of Transp. and Development, 2012-0396, pp. 5-6 (La. App. 1 Cir. 12/28/12), 112 So.3d 856, 860-861, writ denied, 2013-0274 (La.3/15/13), 109 So.3d 386. Defendants have pointed to no constitutional authority divesting the district courts of original subject matter jurisdiction in this instance. Thus, the constitutional claims brought by plaintiffs were properly before the trial court. We find no error in the trial court’s ruling denying the exceptions raising the objections of lack of subject matter jurisdiction, prematurity, and improper cumulation.

Merits of the Appeal

Preliminary InjunctionIStandard of Review

A preliminary injunction is an interlocutory procedural device designed to preserve the status quo between the parties, pending a trial on the merits. Acadian Ambulance Service, Inc. v. Parish of East Baton Rouge, 97-2119, p. 7 (La.App. 1 Cir. 11/6/98), 722 So.2d 317, 322, unit denied, 98-2995 (La.12/9/98), 729 So.2d 583. Generally, plaintiffs seeking issuance of a preliminary injunction bear the burden of establishing by a preponderance of the evidence a prima facie showing that they will prevail on the merits and that irreparable injury or loss will result without the preliminary injunction. La. Code Civ. P. art. 3601; Tobin v. Jindal, 2011-0838, p. 4 (La.App. 1 Cir. 2/10/12), 91 So.3d 317, 320. However, a threat of irreparable injury need not be shown when the deprivation of a constitutional right is at issue or when the act sought to be enjoined is unlawful. Piazza’s Seafood World, LLC v. Odom, 2007-2191, p. 10 (La.App. 1 Cir. 12/23/08), 6 So.3d 820, 826; Acadian Ambulance, 97-2119 at 8, 722 So.2d at 322.
Although the judgment on the preliminary injunction is interlocutory, a party aggrieved by a judgment either granting or denying a preliminary injunction is entitled to an appeal. La. Code Civ. P. art. 3612(B); Piazza’s Seafood, 2007-2191 at 9, 6 So.3d at 826. We are, however, mindful that appellate review of a trial court’s issuance of a preliminary injunction is limited. The issuance of a preliminary injunction addresses itself to the sound discretion of the trial court and will not be disturbed on review unless | i9a clear abuse of discretion has been shown. Concerned Citizens for Proper Planning, LLC v. Parish of Tangipahoa, 2004-0270, p. 5 (La. App. 1 Cir. 3/24/05), 906 So.2d 660, 663.

Discussion

On appeal, Governor Jindal asserts that La. Const, art. IV, § 5, La. R.S. 49:215, and La. R.S. 49:970 grant expansive gubernatorial authority to oversee State departments and agencies as well as rules and regulations adopted by those agencies.[18] It was pursuant to this vast authority that Governor Jindal maintains he issued Executive Orders Nos. BJ 2014-6 and BJ 2014-7. Governor Jindal contends the record is void of any evidence that he exceeded his authority, but rather *1003 that the evidence shows that his actions were valid, constitutional exercises of his authority. He argues that the trial court erred in enjoining Executive Orders Nos. BJ 2014-6 and BJ 2014-7 without first determining whether the orders were unconstitutionally issued or applied.
The DOA defendants argue that it was within their authority and responsibility to act on Governor Jindal’s executive orders and investigate whether BESE was in compliance with procurement laws. In brief to this court, the DOA defendants maintain that “[i]f DRC’s services exceeded the scope of the contracts, payment of public funds was not proper.” They further assert that if DRC was performing “unapproved services ... which should have been the subject of a new procurement for competitive proposals, then DOA was responsible to take appropriate action.” The DOA defendants contend that neither plaintiffs nor BESE established any immediate, irreparable harm resulting from any unlawful actions by them, thus, the trial court erred in issuing a preliminary injunction. In the alternative, the DOA defendants argue that the scope of the preliminary injunction is overly broad. They assert that to any extent the preliminary injunction would restrain | 2qDOA officials from requiring BESE’s compliance with procurement statutes in the future, the judgment exceeds any relief to which plaintiffs and/or BESE may have been entitled.
In response, plaintiffs argue the evidence supports a finding that they demonstrated irreparable harm, noting that such a showing was not necessary in this case because the conduct sought to be restrained herein was unconstitutional and unlawful. With regard to the scope of the preliminary injunction, plaintiffs assert that nothing in the trial court’s order prevents the DOA defendants from auditing DOE’s contracts in years to come, as they have continued to do, without objection from plaintiffs, since the trial court’s preliminary injunction was entered. Thus, plaintiffs maintain, the trial court’s preliminary injunction is appropriate in scope considering the evidence presented. Finally, plaintiffs point out that Governor Jindal’s authority to issue otherwise lawful executive orders was never in dispute. Rather, plaintiffs contend, Governor Jindal acted outside of his lawful powers in issuing Executive Orders Nos. BJ 2014-6 and BJ 2014-7, which unconstitutionally usurped the constitutionally granted power of the Legislature and of BESE.
Following the hearing on the motion for preliminary injunction, the trial court issued written reasons for judgment, providing, in pertinent part, as follows:
The evidence shows that in 2010, the plaintiffs and defendants chartered a crusade to raise the expectations and standards of education in the State of Louisiana. On January 12, 2010, [BESE] approved Louisiana’s participation in the Council of Chief State School Officers common core standards consortium of states to develop common academic standards that are internationally benchmarked and further approved the state’s participation in any assessment consortium of states to implement and develop common, high quality assessments aligned with the common core standards as requested by [DOE]. This same board later affirmed its commitment to adopting common core standards by issuing a resolution on May 20, 2010.
On June 8, 2010 the Governor of the State of Louisiana, Bobby Jindal, in his official capacity as such, along with the State Superintendent of Education, Paul G. Pastorek, signed a [MOU] between the State of Louisiana and other mem- *1004 ■ ber states of [PARCO] again committing the State of Louisiana to the implementation of common core standards in Louisiana. Thereafter, the1 Louisiana Legislature-in Act 275 of the 2012 Regular Session amended and re-enacted LSA— R.S. 17:24 et seq. relative to the Louisiana Competency-Based Education Program and the Louisiana Educational Assessment Program; to provide relative standards; to provide relative testing; .specifically directing, among other things, that [DOE], with the approval of [BESE], ... develop and establish |⅞1 statewide content standards for required subjects to be taught in the public elementary and secondary schools of this state and that beginning with the 2014-2015 school year, standards-based assessments implemented by [BESE] in English language arts and mathematics, ' shall be based on nationally recognized content standards that represents the knowledge and skills needed for students to successfully transition to post-secondary education and the workforce. This law requires that [DOE] and BESE implement nationally recognized assessment testing in Louisiana.
Again, beginning in 2010, all of the parties to this proceeding, along with the Louisiana Legislature, began a collaborative crusade to raise the standards and expectations of education'in Louisiana. Accordingly, the evidence shows that the public body charged with the legal duty to adopt education policy in this state (Legislature) and the public body charged with the legal duty to implement that policy (BESE) began working to implement common core beginning in the 2014-2015 school year. This activity included engaging the defendants, [DOA] and [OCR’s] involvement in the procurement of state contracts to secure the vendors necessary to' implement the legislative directive or common core. Evidence presented proves there -was much discussion among these parties relating to the contract with [DRC] and its status as a “Sole Source” vendor for the implementation of common core. This evidence indicates this activity took plátíe as far back as December, 2010. The contract with DRC was eventually approved as a “Single Source” contract with contract term that ran through 2015. However, on June 18, 2014, the Interim Director of [OCR] notified John White, the Superintendent of [DOE] that “upon close review” of the contract with DRC and the approval of amendments the contract with DRC would be temporarily retracted. This decision and the effects as a result thereof lie at the-root of [plaintiffs’] claims.
The plaintiffs Mickey Landry, Executive Director of Choice Foundation, Erin Comeaux, a parent of three children in public schools, Courtney Dumas, a fourth grade teacher in the public school system, and John White, the State Superintendent of [DOE] all testified at the hearing and each testified to, among other facts, that the [defendants’] actions have caused them to experience loss of investment of time and money, that they have detrimentally relied upon the positions and actions taken by education officials in preparing students, teachers, administrators and schools for the future of assessment testing in Louisiana; and that the action has created a state of chaos among parents, teachers and administrators of schools and basically that they lack any assurance that may give them some idea as to the standards that all of them will be held accountable to in the near future. No persons more affected by the decision of the defendants are those parents, teachers and students of the fourth grade in *1005 Louisiana. In the fourth grade, a student is required' to pass an exam in order to be promoted to the next grade. At this moment in time, as a result of the [defendants’] action, these individuals and schools have no idea of what the testing may consist of causing the probability of success among teachers, schools and students-to suffer. Meanwhile, each within this class is also being assessed as to their success as teachers, schools and students as a result of the outcome of these, unknown tests and assessments. In fact, the evidence even indicates a [teacher’s] pay and/or entitlement to bonus income is predicated upon these assessment tests' upon which, at the present time, are none as a result of the [defendants’] actions.
| MThe defendants did not present any witnesses at the hearing but did introduce documents during the examination of witnesses and the defendant, Bobby Jindal, Governor of the State of Louisiana, through counsel did enter a stipulation during the hearing that he intended to use the authority vested in him as Governor to remove the State of Louisiana from common core. There was no evidence presented at the hearing attempting to establish or prove any reason or reasons for any of the actions taken by the defendants in “retracting” or “suspending” the contract with DRC except what was testified to by [plaintiffs’] witnesses on cross examination and from what the court was able to read and review. The defendants further failed to produce any evidence that the plaintiffs have violated any law concerning the procurement of state contracts.
The evidence does prove that the contract with DRC, which was the contract that was originally approved in accordance with state procurement laws but now retracted, and the court must only assume it was done so under the same laws, was the contract that was intended by all to be used in implementation of the legal requirement for nationally recognized assessment testing in Louisiana, the education policy established by the Legislature. Further, the evidence is undisputed that this'contract has in fact been retracted after “close review” by [DOA] through' [OCR].' While [OCR] may have the statutory authority to review, approve and audit state contracts, the collective action of the defendants have caused considerable harm to the public education system in Louisiana.
As it stands in Louisiana today, according to the law,, students in the fourth grade in Louisiana will take some form of high-stakes leap test at the end of the 2014-2015 fourth grade school year and each of these students must perform to a certain standard in order to be promoted to the next grade. However, the evidence presented at the hearing of this matter proves that the content of these assessment test[s] to be issued to these students as well as the materials needed for teachers to prepare these students for these test[s] are unknown; therefore, the evidence is clear that this state of the unknown has caused anxiety and other harm to the parents, teachers, administrators and students in Louisiana. [Plaintiffs’] harm is time and the loss- thereof. The loss of time is irreparable. With each passing day teachers and parents lose time preparing students for high stake testing, and there is a lot. riding on the student’s successful performance on these tests.
The court has fully reviewed and instructed itself on the law governing the issuance of injunctions against these defendants. The Louisiana Constitution is clear. The Louisiana Legislature shall provide for the education of the people *1006 of the state and shall establish and maintain a public educational system and BESE is a constitutionally created entity with a mandate to supervise and control the public elementary and secondary schools and special schools in the state. La. Const, art. VIII, Sect. 1. While the judicial branch should rarely, if ever, enjoin the executive branch of government claiming to be acting within its statutory authority, the court does in fact have the authority and should exercise such authority to enjoin the executive branch of government when the evidence submitted to the court supports the finding by a preponderance of the evidence that the conduct sought to be enjoined causes irreparable harm and the [plaintiffs’] likelihood of prevailing at the trial of the merits on their case. While the plaintiffs are not required to prove irreparable | ^harm when the conduct sought to be enjoined is unconstitutional or unlawful, the court finds that the plaintiffs have satisfied this burden along with the burden of proving that they are entitled to the relief they seek and the likelihood of prevailing on the merits.
The [plaintiffs’] Petition for Injunction seeking to enjoin the defendants from enforcing, applying, and/or implementing in whole or in part, Governor Bobby Jindal’s Executive Orders Nos. BJ 2014-6 and BJ 2014-7, and [OCR’s] June 18, 2014 retraction of [state] issued contract relating to the implementation of state educational assessments is hereby granted.
The Louisiana Constitution is the highest expression of the will of the people. The people of Louisiana are served only if the courts recognize and enforce the provisions of the constitution. “The starting point in the interpretation of constitutional provisions is the language of the Constitution itself. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect.” Canal/Claiborne, Ltd. v. Stonehedge Development, LLC, 2014-0664, p. 5 (La.12/9/14), 156 So.3d 627, 632 (internal citations omitted). Unequivocal constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. Board of Directors of Indus. Development Bd. of City of Gonzales, Louisiana, Inc. v. All Taxpayers, Property Owners, Citizens of City of Gonzales, 2005-2298, p. 15 (La.9/6/06), 938 So.2d 11, 20.
The Louisiana Constitution divides the powers of government into three separate branches: legislative, executive and judicial. La. Const, art. II, § 1. Our constitution further provides that no branch may exercise power belonging to another. La. Const, art. II, § 2 (“[N]o one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.”). The legislative power of the State rests exclusively in the Legislature. La. Const, art. Ill; § 1; La. Const. art. II, § 1; State v. Alfonso, 99-1546, p. 6 (La.11/23/99), 753 So.2d 156, 160.
As clearly set forth in the Louisiana Constitution, the Legislature “shall provide for the education of the people of the state and shall establish and maintain a public educational system.” La. Const, art. VIII, § 1. BESE is a constitutionally created entity with a mandate to “supervise and control the public elementary and secondary schools [^and special schools under its jurisdiction,” with “budgetary responsibility for all funds appropriated or allocated by the state for those schools, all as provided by law.” La. Const, art. VIII, § 3(A). BESE also has “other powers, *1007 duties, and responsibilities as provided by this constitution or by law.” Id. In Aguil-lard, 440 So.2d at 709, the Louisiana Supreme Court concluded that BESE has “the power to supervise and control the state’s public schools, which includes the determination of educational policy, but that power is subject to the direction of the legislature by virtue of the clear language of the constitutional article which creates BESE and defines the scope of its power.”
As argued by plaintiffs in brief to this court, defendants’ accusations against BESE in the proceedings below regarding State procurement law were a mere pretext to cloak their true intent to influence education policy in Louisiana, over which the Louisiana Constitution grants exclusive authority to the Legislature and BESE. Governor Jindal’s Executive Orders Nos. BJ 2014-6 and BJ 2014-7, as well as OCR’s June 18, 2014 suspension of the DRC contracts, constituted an unconstitutional interference with contracts for student assessment services entered into by BESE and the DOE to fulfill mandates by the Louisiana Legislature regarding testing and content standards.
On review of the record and the preliminary injunction issued herein, given the evidence presented by plaintiffs and BESE supporting their entitlement to the relief sought, we find no abuse of the trial court’s discretion in its determination that plaintiffs and BESE made the requisite prima facie showing sufficient to warrant the grant of a preliminary injunction in their favor, i.e., that the conduct sought to be enjoined causes irreparable harm (although the trial court noted the plaintiffs were not required to prove this element) and that they will prevail on the merits. However, with regard to the language of the trial court’s September 10, 2014 judgment, we agree with the DOA defendants’ argument on appeal that the scope is overly broad. There is no evidence in the record that either plaintiffs or BESE sought any relief beyond the 2014-2015 school year. In fact, as testified to by Superintendent White, both of the DRC contracts at issue terminate on June 30, 2015. While we doubt that this preliminary injunction has served to prevent the DOA defendants from continuing with the normal course of ^business as it relates to BESE and the procurement process, we amend the language of the September 10, 2014 judgment to provide that the preliminary injunction is limited to actions affecting the 2014-2015 school year. In all other respects, the judgment is affirmed.
CONCLUSION
For the above and foregoing reasons, defendants’ application for writ of supervisory review is denied. Additionally, the September 10, 2014 judgment of the trial court, granting the motion for preliminary injunction filed by plaintiffs and BESE and denying the DOA defendants’ exceptions related to BESE’s intervention, is amended to include the following language: “IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that this preliminary injunction is limited to actions affecting the 2014-2015 school year.” In all other respects, the judgment is affirmed. Appeal costs in the amount of $3,284.50 are assessed equally between Governor Jindal and the DOA defendants.
APPLICATION FOR SUPERVISORY WRIT OF REVIEW DENIED; SEPTEMBER 10, 2014 JUDGMENT AFFIRMED AS AMENDED.

.' Navis Hill is the mother of four children who are currently attending school in Orleans Parish, where she and her children are domiciled.

. ■ Michael and Amanda Stenson are parents of a minor child who is entering public high school in Orleans Parish, where they are presently domiciled.

. Illumani Johnson is the parent of a child who is attending school in Orleans Parish, where she and her child are currently domiciled.

. Erin Comeaux is the mother of two minor children who are currently enrolled in the Jefferson Parish public school district. They are domiciled in Jefferson Parish.

. Latricia Bowers is the mother of á child currently attending public school in East Baton Rouge Parish, where they are domiciled.

. Carrie Adams is the mother of two children who are currently attending public school in East Baton Rouge Parish, where they are domiciled.

. Courtney Dumas is a teacher at Lowery Elementary School in Ascension Parish, where she is domiciled.

. Catherine Gplden is a teacher, at Esperanza Charter School in Orleans Parish, where she is domiciled.

. Choice Foundation is a charter management organization that manages three charter schools in Orleans Parish.

. Executive, Order No. BJ 2014-6 provides, in pertinent part, as follows:
SECTION 1: The revisions to Bulletin 118-Statewide Assessment Standards and Practices (LAC 28:CXI.113), published as a final notice on May 20, 2014, are hereby suspended.
SECTION 2: [BESE] is authorized and directed to implement, a process to authorize paper assessments in the 2014-2015 school year.
SECTION 3:. The Louisiana Department of Education, [BESE] and any other departments, commissions, boards, offices, entities, agencies, and officers of the State of Louisiana, or any political subdivision thereof, are authorized and directed to comply with the suspension of the revisions to LAC 28:CXI.113 of this Order.
SECTION 4: This Order is effective upon signature and shall remain in effect unless amended, modified, terminated, or rescinded.

. Executive Order No. BJ 2014-7 provides, in pertinent part, as follows:
SECTION 1: The Department of Education and [BESE] are directed to undertake a transparent, competitive procurement process in accordance with Louisiana law to obtain academic assessments for Louisiana’s schoolchildren.
SECTION 2: The [DOA] is directed to conduct a comprehensive accounting of all Louisiana expenditures and resources related to PARCC, what services and products have been received in return for such expenditures, and copies of all contracts or other agreements in place or in negotiation for the purchase of an assessment. The [DOA] is further directed to ensure the De *993 partment of Education and [BESE’s] compliance with Louisiana law in the procurement of academic assessments for the 2014-2015 school year and subsequent years.
SECTION' 3: All departments, commissions, boards, agencies, and officers of the state of Louisiana, or any political subdivision thereof, are authorized and directed to cooperate in implementing the provisions of this Order.
SECTION 4: This Order is effective upon signature and shall continue in effect until amended, modified, terminated, or rescinded by the governor, or terminated by operation of law.

. The DOA defendants sought supervisory review with this court of the trial court’s denial of their exceptions to BESE's intervention. On December 15, 2014, this court denied the writ application. Hill v. Jindal, 2014-1746 (La.App. 1 Cir. 12/15/14) (unpublished writ action).

. During the August 18, 2014 hearing, there was a discussion about the possible introduction of newspaper articles wherein Governor Jindal made comments concerning his intent with regard to getting the State out of Common Core. It was at that time that counsel for Governor Jindal entered the following stipulation into the record: "I’ll stipulate to that. I’ll stipulate the Governor is opposed to Louisiana and Common Core, to use the full authority of his office to try to, you know, compel a different outcome within the confines of the law.” The stipulation was accepted into the record, and the newspaper articles were never introduced.

. Governor Jindal originally filed a motion for suspensive appeal, which the trial court . denied, instead granting the governor a devol-utive appeal, which is before us now. Governor Jindal sought supervisory review of the trial court’s denial of his motion for suspen-sive appeal. On November 14, 2014, this court denied Governor Jindal’s writ application. Hill v. Jindal, 2014-1572 (La.App. 1 Cir. 11/14/14) (unpublished writ action).

. In response to this assignment, BESE cites Ciolino v. Castiglia, 446 So.2d 1366, 1369-1370 (La.App. 1 Cir.1984) for the proposition that review on appeal of the trial court’s denial of the DOA defendants’ exceptions to BESE’s intervention claims is unwarranted. Although a judgment on a preliminary injunction is an interlocutory judgment, it may be appealed pursuant to La. Code Civ. P. art 3612. Relying on this court's holding in Ciol-ino, BESE claims that Article 3612 does not authorize appellate review of an interlocutory judgment affecting exceptions with an appeal from a judgment on a preliminary injunction. Based on our review of this matter, we are of the opinion that appellate review of the trial court’s interlocutory judgment overruling the various exceptions raised by DOA defendants as to BESE's intervention is improper at this time. Thus, this assignment of error is without merit and does not warrant any further review.

. Acts 2014, No. 864, § 2, effective January 1, 2015, revised Chapter 17, "Louisiana Procurement Code” of Subtitle III of Title 39, formerly comprised of La. R.S. 39:1551 to 39:1758 as Chapter 17, "Louisiana Procurement Code,” now comprised of La. R.S. 39:1551 to 39:1755.

. For these same reasons, we find ho merit to the DOA defendants’' assignment of error number one, relating to the trial court’s denial of their exception raising the objections of no cause of action and no right of action as to plaintiffs’ claims.

. The Louisiana Constitution provides for the governor’s executive authority as follows: “The governor shall be the chief executive officer of the state. He shall faithfully support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed.” La. Const, art. IV, § 5(A). The authority of the governor to issue executive orders is recognized by La. R.S. 49:215. And, pursuant to La. R.S. 49:970, “The governor, by executive order, may suspend or veto any rule or regulation or body of rules or regulations adopted by a state department, agency, board or commission, except as provided in R.S. 49:967, within thirty days of their adoption.”